BECTON–DICKINSON & CO. v. ROBERT P. SCHERER CORP. et al.

No. 8073.

United States District Court
E. D. Michigan, S. D.

July 17, 1952.

---

Arthur C. Beaumont, Detroit, Mich., Kane, Dalsimer & Kane, New York City, Toner, Crowley & Ackerman, Newark, N. J., for plaintiff.

Marco & Marco, Detroit, Mich., Bair, Freeman & Molinaire, Chicago, Ill., for defendant.

Clair Johnson, New York City, for defendant Lockhart.

PICARD, District Judge.

Plaintiff, Becton-Dickinson & Company, manufacturer of hypodermic syringes and other medical and pharmaceutical equipment and supplies, brought declaratory action against defendant Robert P. Scherer Corporation, large maker of gelatin capsulated medicaments, vitamins and the new needleless hypodermic syringe called "Hypospray," to

(a) set aside a certain contract, dated August 1, 1947, in which plaintiff is licensor and Scherer, licensee, of the Marshall L. Lockhart patents involved herein (U. S. Letters Patent Nos. 2,322,245, 2,-380,534 and related patents) and

(b) to require defendant Scherer to join with it in a disclaimer of all benefits from the Lockhart patents on the theory that they were obtained by inadvertence, accident or mistake, unknown to plaintiff and Scherer when they entered into their contract.

Defendant Lockhart intervened a week after the trial commenced, at our suggestion and by consent of the parties, and plaintiff now seeks to annul the contract entered into by and between it and Lockhart, June 9, 1947, by which plaintiff became the assignee of Lockhart's patents, subject to Scherer's rights as licensee thereof (contract of August 11, 1944 amended by letter agreement of July 20, 1946) and also the contract of August 1, 1947 which superseded the contract dated August 11, 1944 between Lockhart and Scherer.

As a result of Lockhart's intervention, plaintiff also seeks return of $135,000 paid to Lockhart for the patent rights; asks that Lockhart be required to join with Scherer in a disclaimer of those rights; and claims damages from Lockhart, relief of damages from both Scherer and Lockhart and a finding of invalidity of both Lockhart patents.

Plaintiff's charge is that Lockhart committed a fraud on the Patent Office and plaintiff by representing

(a) that he was the originator of the basic idea of an instrument by which medicaments are injected subcutaneously into the human flesh without piercing the epidermis or leaving trace of its point of entry, when, in truth, Sutermeister and Roberts were the inventors thereof; and

(b) that he invented the chemical reaction and cartridge motivating power method of injection of said medicament, when at best, he was only a co-inventor with Gillett and Picciano.

Finally, plaintiff asks that its own needleless syringe be held not to infringe the patents at issue.

Defendants both deny all allegations and seek adjudication of the validity of the Lockhart patents, a holding of infringement by plaintiff and damages from plaintiff as the result of this action.

The Lockhart Hypospray is a barrel shaped instrument about six inches in length, one inch in diameter at the end containing the propelling force and about one-half inch at the other. It has no handle but a push button for a trigger and at the barrel opening, where the bullet would ordinarily emerge, is placed the selected medicament sealed in an ampule from all possible contamination, which is forced through the skin into the flesh when pressure is applied to the trigger releasing a chemical reaction, cartridge or spring, the motivating power by which the necessary dose is injected. The entire mechanism is so constructed as to control the depth, amount and extent of the injection.

### History and Contentions of Parties.

In the early part of 1929 one Arnold J. Sutermeister, a mechanical engineer, had occasion to observe the effects of accidental injection of oil into the hands of workmen when small breaks occurred in high pressure lines of Diesel engines. Once a laborer was struck in the finger by a fine stream of oil traveling at great velocity and although he felt no pain and no visible break appeared in the skin, the finger later became inflamed. Upon lancing, a doctor found "oil clear down around the bone." Sutermeister remembered that as far back as 1923 he, himself, had had a similar experience with water and so, following the 1929 incident, he began some experiments, learning that when he placed his hand over a fine stream of water escaping at a pressure of about 9,000 pounds per square inch there was no mark on his palm and no pain, simply a sense of pressure. In a matter of hours, however, he found a small swelling like a water-blister on the back of his hand opposite the point where the high speed stream had struck, indicating that the water had passed through the entire thickness of his palm without puncturing the skin. In 1932 he built his first machine.

Sutermeister turned over this device, and his observations in connection therewith, to the Presbyterian Hospital at New York City under the direction of its Department of Surgical Pathology wherein further tests were conducted.

At about this time (1935) one Dr. John F. Roberts in order to satisfy the requirements for a special degree at Columbia University (which he received that same year) completed a thesis on jet propulsion of medicaments such as an anesthetic, and deposited the same in the library of Columbia University, College of Physicians and Surgeons, affiliated with the Presbyterian

Hospital. The thesis included a description, with diagrams, of two devices built and used by Mr. Sutermeister and Dr. Roberts in an attempt to demonstrate the utility and practicability of the "jet propulsion of medicaments" idea therein outlined in full detail.

Dr. Roberts' thesis interested Dr. Whipple and others at Presbyterian Hospital, who brought the matter to the attention of Dr. Williams on the Board of Directors of Cambridge Instrument Company, where further development work on the models and suggestions of Dr. Roberts and Sutermeister was begun. Here it was quickly recognized that the machines were too cumbersome and had many other apparent defects. For example, the motivating force was in one part of the apparatus, the injection mechanism in another. Then there was the problem of segregating the medicament to facilitate sterilization and the prevention of possible leakage under high pressure. The main objective at Cambridge was to refine the design to overcome these drawbacks and to advance the machine's practicability. The work was turned over to Howard N. Fawcett, a young project engineer in the Cambridge Ossining plant.

In 1934 defendant Lockhart, admittedly an inventor of ability, became an employee of Cambridge Instrument Company in a special capacity. Among other things he had invented the Electrostethograph, a device for amplifying and recording heart sounds, then in prospect of being manufactured by Cambridge Instrument Company, which company had retained Lockhart as a consultant in its commercial development.

There is no question but that here Lockhart became familiar with both the Roberts thesis and the Roberts, Sutermeister and Cambridge experiments and machines involving needleless injectors. Lockhart was aware also that the Cambridge people were then trying to make essential improvements therein. This is admitted. But it is also not denied that Lockhart suggested to Fawcett that the Cambridge people were "on the wrong track to solve their problems."

It must be apparent, therefore, that at least up to this joint Lockhart's knowledge of needleless injection all came from his special connection with Cambridge and more particularly his friend Fawcett who was engaged in improving the Sutermeister-Roberts machines. It was there also that Lockhart learned of the Roberts thesis, primarily because it happened that his desk at Cambridge was located next to Fawcett's. This he cannot and does not now disclaim.

On July 20, 1935, Lockhart showed Fawcett a sketch of a needleless injection instrument and then began constructing a device to put into effect his own theories about jet propulsion for needleless injection. Later that same year he contacted Fawcett's roommate—one Leslie Gillett, to discuss with him a chemical reaction to force the medicaments from the injection instrument at great velocity through the skin. On October 20, 1935, he wrote a letter to his attorney Mr. Freeman stating he was inclosing a sketch and referring to it as the "brain storm" of "Leslie Gillett and" himself. In that letter he admitted that

"we (Gillett and Lockhart) have conceived a design whereby the necessary pressure is to be generated by chemical reaction much like carbide gas in the old lamps they used to use; * * *"

In the same letter he criticized the Cambridge Company because it was working on some

"type of pump or press to generate pressure to be applied directly to the fluid,"

which he thought was hopeless, insisting that chemical reaction to generate the pressure was the only solution, as advanced by "our" (his and Gillett's) idea.

To offset this, he later wrote Freeman a letter in which he stated that

"none of the ideas involved in this (his) injector were taken from the work that Cambridge was doing * * *."

Sutermeister and Roberts' machine had compressed air as its motivating force; Cambridge had hydraulic liquid. But Lock-

hart, although primarily concerned with the generating power laid down four essentials for a practical instrument. It must be:

1. small;

2. all of the medicament must emerge from the orifice at a constant pressure; a suddenly released force of great velocity;

3. the dose must be sterile; and,

4. the instrument must be easy to sterilize.

Later Gillett brought one Picciano, a young New York University chemist also employed at the Cambridge plant, into the picture. He, according to Gillett and Picciano, suggested the use of a cartridge as the propelling force and during 1935 all three, Gillett, Picciano and Lockhart, worked on such a model and experimented with it.

By 1935 according to the testimony of plaintiff's witness, Sutermeister, plaintiff, Becton-Dickinson and Company, was aware of the Sutermeister-Roberts experiments. Sutermeister stated that some time in 1934 he took his ideas to plaintiff company. He didn't remember with whom he had talked but it was some important official. Sutermeister said that plaintiff had expressed itself as not being interested. Witness Dickinson denies that he talked with Sutermeister and claims he was not aware that Sutermeister had been to his firm, but Sutermeister's testimony is not denied.

In March, 1936, Lockhart, on advice of counsel, filed application for his basic propulsion device in his own name. By 1941 he had not yet received his first patent but he filed a continuation application in 1941 and received that patent in 1943. This is patent No. 2,322,245 the main patent involved. In 1941 he filed a petition advancing the spring as the propelling power. A division was ordered in 1943, Lockhart receiving this patent (2,380,534) in 1945. Since then this design has been developed greatly by defendant Scherer so that today it is a compact "flashlight" weighing between ten and twelve ounces, which in appearance bears no resemblance to the crude machines used by Sutermeister, Roberts and Cambridge. It can easily be carried by a physician or surgeon with his other instruments in a small bag and admittedly has many advantages and improvements over any other such contrivance, as will be enumerated later herein.

Plaintiff reads Lockhart's original petition and the patent resulting therefrom as a series of claims by Lockhart that he invented the basic idea of needleless hypodermic injection and this court unequivocably holds now that if that is the true interpretation to be placed on the Lockhart application file wrapper and patents, such a statement is absolutely false. In short, if the case turns on that point the answer is not difficult because Lockhart never had any idea about this type of injection until after his attention had been directed to it by Fawcett and while he, Lockhart, was employed on his special work at Cambridge.

But the facts also show that the idea was not an invention of either Sutermeister or Roberts' because almost 70 years before a French inventor had devised a needleless injector that was called the "Aquapuncture." The force was only 25–30 atmospheres exerting a pressure of not more than 400 pounds per square inch and it projected upon the skin a liquid capillary jet, the tissues made way, permitting the medicament solution to penetrate into the skin. It was not a success. It is well to note that "Aquapuncture" is referred to in the Roberts thesis, on page 3.

Plaintiff chiefly predicates its entire suit on defendant Lockhart's alleged fraud, but there are other facts which are covered in the findings to which we now proceed.

Findings of Fact and Some Conclusions of Law.

Although plaintiff claims that it knew nothing of Lockhart's alleged fraud until the spring of 1948 after it had purchased Lockhart's rights on June 9, 1947, Lockhart could not have deceived plaintiff into entering into that contract by representing that he invented the needleless injector because plaintiff's own witness, Sutermeister, stated he had shown and tried to interest plaintiff in the Sutermeister-Roberts machines more than ten years previously. Furthermore, by 1936 the Roberts thesis was a matter of public knowledge and

the court finds it very difficult to believe that an institution so deeply concerned with many inventions and formulas pertaining to the medical profession, with unlimited finances and other resources, a well informed, able group of patent attorneys, located in the immediate vicinity where these events were happening and, finally, with its excellent research department, was not aware sufficiently of what had been transpiring. In our opinion it was or should have been on guard when, and if Lockhart or any one else claimed the basic idea of needleless propulsion. Of course such a situation may have happened. It's possible, but not probable. Still if we discard Sutermeister's story completely—which we are not inclined to do unconditionally, since it is not denied and he is plaintiff's own witness—it is our belief that if plaintiff didn't know that Lockhart was not the originator of the idea, it should have. In any event there was also the Cambridge machine and the Cambridge suit in 1948 concerning which plaintiff must have become familiar. Therein Cambridge laid claim to Lockhart's Hypospray but the suit was settled and Cambridge recognized Lockhart as the inventor. The trade and patent journals were full of the happenings in this case which we cannot believe were unknown to plaintiff. Nevertheless plaintiff took no action until April 1949.

Secondly, we recognize that it is most unusual for the courts to permit plaintiff to urge defendant's fraud on the Patent Office to invalidate a patent. 35 U.S.C.A. § 69; United States v. American Bell Telephone Company, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144.

This is particularly true when the plaintiff is the vendee (herein licensor) of the very patents it seeks to destroy. St. Joseph Iron Works v. Farmers Mfg. Co., 4 Cir., 106 F.2d 294. On the contrary the rule is apparently different where the infringer is the defendant. Here the court may take cognizance of the patentee's fraud. Hazel-Atlas Co. v. Hartford, 322 U. S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. And the tendency is now to broaden the scope of attacking a patent for fraud on the Patent Office, on the grounds of public policy—

Journal of the Patent Office Society, July 1951. Precision Instrument Mfg. Co. v. Automotive Manufacturing Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

And since, in this case, defendant Lockhart has asked that plaintiff be designated an infringer—a claim we must consider—then a fortiori we must also examine the fraud, if any, upon the Patent Office.

In any event we are herein adopting the broader view but without prejudice to any action which the Patent Office may wish to initiate. The power to invalidate the Lockhart patent still lies with the United States (United States v. American Bell Telephone Co., supra) which has not intervened as amicus curiae but if and when it should commence such action Lockhart could, undoubtedly, advance laches as an element of defense. United States v. American Bell Telephone Company, supra, also United States v. Cold Metal Process Co., D.C., 62 F.Supp. 127.

And we hold that on the evidence produced in this case the Patent Office couldn't have been deceived by any alleged claims by Lockhart that he was the first to invent the needleless injector instrument for two reasons. First, his file wrapper and application on which the main patent was granted states, on page 16, that

"* * * unsuccessful attempts have heretofore been made to accomplish hypodermic injection * * *."

This reference could only be to this new method being presented because "needles" as injectors had been used for years and were "successful." And, secondly, as a whole the patent indicates that Lockhart's was merely an improvement on the basic idea of needleless injection.

It must be admitted that in the file wrapper also, containing the history of the first patent, Lockhart and his attorneys came dangerously close to claiming that Lockhart was giving the world the "needleless" Hypospray injector for the first time, but minute analysis of each such instance reveals that the reference is always to some particular claim that was not granted by the Patent Office. This is true except in the wording of the original patent itself

where defendant's arguments as to the intended meaning of certain words are in direct conflict with those of plaintiff. You can rationalize either way from the briefs filed before the Patent Office and the wording of the main patent as issued, with substantial material for background, but since the plaintiff's proof of fraud must be clear, unequivocal and convincing, U. S. v. Maxwell Land-Grant, 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949; United States v. American Bell Telephone Company, supra; United States v. Cold Metal Process Co., supra, plaintiff must fail in its charge. In other words, with the complete record before us, we cannot hold that there is proof that Lockhart misrepresented the facts to the Patent Office.

In this connection we must remember that an applicant takes an oath that he believes himself to be the original or first inventor or discoverer of the art, machine, etc., for which he solicits a patent and Lockhart could and did take the oath provided in 35 U.S.C.A. § 35 which is as follows:

35 U.S.C.A. § 35.

"The applicant shall make oath that he does varily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement * * * for which he solicits a patent; that he does not know and does not believe that the same was ever before known or used; * * *."

The act also provides:

35 U.S.C.A. § 31, R.S. 4886.

"Any person who has invented or discovered any new and useful art (which includes method), machine (which includes devices) * * * or any new and useful improvements thereof * * * not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, * * * may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

and 35 U.S.C.A. § 33, R.S. 4888, which primarily summarizes what these due proceedings are, and after stating how the application must be filed and what the description shall contain, continues:

"And in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

But what the applicant is always referring to is the machine he has invented which in the instant case is an improvement, so much different and better than anything that had been developed up to that time that it presented something entirely new.

### Gillett and Picciano.

Having disposed of the issue that Lockhart made claim to the generic idea of needleless propulsion and having decided that Lockhart was guilty of no fraud upon the plaintiff or the Patent Office we come then to the claim that Gillett and Picciano are the real inventors of the method part of this design, or that Lockhart was at most only a co-inventor.

The Gillett and Picciano angle of this part of the controversy is more embarrassing for Lockhart than the other claims. Particularly is this true of that letter written by Lockhart to his attorney in 1935 in which he refers to his and Gillett's joint "brain storm." Gillett testified that he gave Lockhart the idea of chemical reaction as a propelling motivating force and that Picciano suggested the cartridge. The spring which appears to be the most feasible of all is certainly Lockhart's.

We have debated this particular question of fact and have come to the conclusion that Gillett and Picciano certainly didn't initiate the idea of what should be the motivating force. Their testimonies were contradictory and confusing. They did not impress and we have concluded that the "method" theories for needleless jet propulsion were advanced by Lockhart.

originally, for discussion and suggestions from the other two. Incidentally, the facts are uncontested that Lockhart couldn't convince Fawcett that Cambridge was on the wrong track and Gillett was Fawcett's roommate. Wouldn't Gillett have told Fawcett in 1936 if the chemical reaction had been his idea? Or at least wouldn't he have told Packard of Cambridge when he wrote to Packard?

We believe and find the fact to be that Gillett and Picciano were merely helpers carrying out Lockhart's instructions and that they realized this in 1936. On this point we maintain that Packard's report is illuminating. There Packard reflects the interviews he had had with Gillett and Picciano while fresh in his mind and he said that Picciano had been called in for "chemical advice." Packard's letter indicated the status of both Gillett and Picciano to be assistants or helpers to Lockhart by saying that Lockhart was always getting some one to help him. If he knew he had reason to suspect Lockhart of fraud on Gillett and Picciano would he have kept Lockhart working for Cambridge until 1942, six years after Gillett and Picciano had first told him about their connection with Lockhart? Wouldn't he have used this evidence in the Lockhart-Cambridge suit in 1948? Furthermore, when Lockhart took out his patent Gillett and Picciano had had some experience in getting a patent. Still they did not claim that they were co-inventors with Lockhart when they discussed Lockhart's patent with Packard later in 1936. Nor do Gillett's and Picciano's stories jibe with other facts and particularly not with Mrs. Lockhart's diary, an unusual document which we believe was verified.

We hold and find the fact to be that all the method ideas necessary to accomplish the desired result, lacking in all previous experiments, came from Lockhart, who evidently is a genius but who, as a witness, leaves much to be desired. As heretofore stated, Lockhart, is an inventor. He has that turn of mind. Not only has he invented the "Electrostethograph" but he has invented the "Hyposeal" sold by the plaintiff itself under a license; the "Twin-pak", a plastic case for holding pairs of hypoder-

mic needles; the "Univial" and the "Hypovial", all of which inventions were commercially successful.

Gillett never invented anything and Picciano only invented some small mechanical instrument. Picciano and Gillett admitted that they abandoned all idea or hope of developing a satisfactory needleless injector. As a matter of fact so did Sutermeister, Roberts, Cambridge and Squibb. Lockhart fought on. Picciano and Gillett saw no chance for success; Lockhart did. In any event Gillett and Picciano certainly have slept on their rights too long, if they had any, and we would not be surprised if the passage of time and dimming of memory of what actually happened back there in 1935-6, together with the power of suggestion in 1951, that would come by being asked the extent of their activities with Lockhart, might not now give them visions of major participation in this invention where at the most they were only assistants. Had their protest come immediately, then there would be more faith in its credibility, but we are inclined to believe Lockhart when he states that when he unfortunately—used the words "joint brain storm" in the Freeman letter, he was referring to that part of the diagram which accompanied that letter where Gillett had roughed some drawings on the same piece of paper with other sketches admittedly made by Lockhart and which features were later never used by Lockhart in any of his patents.

But let us now state that the oral testimony in this case was far from satisfactory on both sides. In fact we have had to delve deep and use physical facts more than rely on the verbal evidence to arrive at what we believe to be the equitable and proper conclusion.

### The Lockhart Invention.

Since we must pass upon the validity and infringement as well as fraud and contracts resulting therefrom we believe it advisable —accepting the agreed fact that the Hypospray, whether Lockhart's or plaintiff's, was a needed inventable improvement in the art—to enumerate just what Lockhart did to entitle him to a patent.

Let us therefore catalogue some of the differences that Lockhart's instrument had over Aquapuncture, the Sutermeister-Roberts and Cambridge designs as well as its practical inventable advantages.

1. Lockhart has a small portable instrument. The Roberts-Sutermeister and Cambridge developments were heavy, unwieldly and non-portable.

2. In Lockhart's the propelling medium is within the instrument from which the medicament is suddenly forced. The others all use some outside manual compelling compressed air tank or hydraulic pumps to serve as the motivating force, which, regardless of what it might be, was not suddenly applied.

3. The Lockhart instrument can control the amount of the hypodermic injection and its depth into the flesh. The others cannot.

4. The Lockhart device has sufficient pressure at the outset of the injection so that all liquid is injected. The others have not and much (over 50 percent) of the medicament is lost in dribbling out until the pressure builds up before it can be forced through the skin.

5. The Lockhart device is designed to have the orifice touching the skin. In the others the orifice was spaced about one centimeter from the skin and the anesthetic was "sprayed."

6. The Lockhart patent has a separate ampule which contains a sterile measured dose of medicament and the instrument can be easily sterilized. The other devices have no separate ampule and sterilization was very difficult if not impossible.

7. Using a separate ampule as Lockhart does the possibility of mixing the medicaments is entirely overcome. This feature is a hazard in the rival designs.

So while it is apparent that the idea of needleless jet propulsion is not Lockhart's, neither does it belong to Sutermeister or Roberts. If any one can make that claim, it is the inventor of Aquapuncture. Still the fact remains that the Lockhart Hypo-

spray is a practical instrument and that the Cambridge Company (1939), Roberts and Sutermeister (1935) all gave up the task of inventing such a machine,* while Lockhart continued with his work.

■ That all those then working on the design in 1936 were, to say the least very dubious of making a machine that would work and be practical is evidenced at several places in the Roberts thesis where he admits that their (Roberts and Sutermeister's) machine was not a solution, concluding his thesis with the statement that

"the method is not applicable for hypodermic medication because of the large amount of solution wasted on the skin surface."

and Whipple of Cambridge referring to the Roberts-Sutermeister and Cambridge final apparatuses has said they carry

"with them too much uncertainty to make applicable in clinical work,"

See also his statement that such a machine would cause trauma in sterilization and

"make the method too hazardous to use in an operating room."

And

"He is the inventor and is entitled to the patent who first brought the machine to perfection and made it capable of useful operation." Pointer v. Six Wheel Corporation, 9 Cir., 177 F. 2d 153, 157.

Conclusions on Findings of Facts.

We believe that not only was there no fraud by Lockhart on plaintiff but by his perseverance he has in all probability done the most to give the medical profession and mankind a useful instrument that will minimize the number of instances where the mere appearance of a hypodermic needle in the hands of the doctor or nurse is the same as a trauma upon the patient; that is practical, and that if Roberts or Sutermeister or Cambridge or anybody else ever had any idea of developing this type of injection for practical uses they abandoned it long ago while Lockhart kept on.

* Their old devices can allegedly be found in a store room of the College of Physicians and Surgeons at Columbia University in a partially disassembled condition.

674

■ All previous machines were impractical and they were impractical because the experimenters refused to listen to Lockhart's suggestions back in 1935. And while holding that the generic idea of needleless injection was not Lockhart's the methods and designs by which the instrument became practical were Lockhart's. This is undoubtedly true of the gas or spring powered patent of Lockhart which is not seriously attacked by plaintiff except to claim that it is tainted by its relationship to the first patent. We hold the second patent good in any event as an improvement and "new method" on the theory that every patent must stand on its own feet.

There is still another point of fact which this court believes ought to be recorded here and which may throw some light on the possible purpose behind this law suit and that is this: Lockhart has sold all patent rights in Hypospray to plaintiff for which it must pay Lockhart certain royalties on each instrument. Scherer is the licensee and manufactures, sells and distributes the "Hypospray." There are, however, conditions in plaintiff's contract with Scherer that would give it the right to manufacture Hypospray in competition with defendant Scherer but so far Scherer has refused to commit "the act" by which that possibility becomes an actuality. Plaintiff cannot manufacture this instrument. Only defendant Scherer has that right. All plaintiff can get is a royalty, part of which goes to Lockhart. So plaintiff has now constructed an instrument of its own that is a complete duplication in all essential elements of the Lockhart device. If this court finds merit to plaintiff's assertions of fraud plaintiff is almost ready to start manufacturing its own "Hypospray" under a different name. And to clear that issue we digress from the above theme to now hold that plaintiff's instrument infringes on Lockhart's patents which we also hold are valid. But the issues of patentability and infringement are, in fact, not very seriously contested.

But returning to our discussion of the possible motive for this action—we find that if Scherer joins with plaintiff in a disclaimer and such disclaimer is good, then plaintiff can enter the field against Scherer and make needleless hypodermic syringes. Or if plaintiff can prove that Lockhart obtained his patents by fraud on the Patent Office so they can be set aside, then the field is also open and plaintiff is all ready with its own injector to battle defendant Scherer. But if—and this is the most unusual part of this bizarre legal action—if plaintiff loses this law suit it still has the Lockhart patents with future possibility of manufacturing or at least participation in Hypospray royalties. Since plaintiff is the country's leading manufacturer of the hypodermic syringe as the profession has known for years, which product will suffer if and when the needleless hypodermic syringe becomes a commercial success, plaintiff has a potent reason for this action. But this court does not so charge since the plaintiff, in its expressed views found itself in an embarrassing position if it had not brought this action. Still the fact remains that plaintiff cannot completely lose in this case regardless of our ruling except as it might have caused damages to defendants or either of them by this law suit.

We do not find it necessary to expressly decide the question of "clean hands" in arriving at our decision herein.

Conclusions of Law.

To the above findings of fact and some citations given therein we have applied the following conclusions of law and hold that if Lockhart was guilty of fraud in procuring his patent there could be no disclaimer under Title 35 U.S.C.A. § 65, which specifically provides that a patentee may disclaim when errors in his claims result

"through inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, * * *."

We found no fraud of the weight required by our decisions.

■ It is also apparent that while the applicant is supposed to know what the prior art is, Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422, there is no requirement that an applicant for a patent call the examiner's attention to prior art unless there is possible fraud or inequitable-

675

ness as stated in Precision Co. v. Automotive Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

As to the matter of infringement and patentability, we cite Minerals Separation, Ltd., v. Hyde, 242 U.S. 261 at 270, 37 S.Ct. 82, 61 L.Ed. 286; Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428 at 440, 441, 31 S.Ct. 444, 55 L.Ed. 527; Motor Improvements, Inc. v. General Motors Corp., 6 Cir., 49 F.2d 543 at 545; and Black and Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910 at 913–914, holding substantially that degree of utility attained, although only a step beyond prior art, determines patentability and precludes infringement claims as to the improvements. We rule that the Lockhart patent met the test of patentability and further, that plaintiff did not enter any of these contracts through a mistake of fact which is a necessary element. Williston on Contract (1937) Sec. 1593, Vol. 5, page 441.

As to the testimony of Gillett and Picciano.

Under Manny v. Garlick, 135 F.2d 757, 768, 30 C.C.P.A., Patents, 1008, the court laid down the rule that

"Where there is a joint application alleging a joint invention which is placed in interference with another applicant, such applicant is entitled to rely upon the rule that conception and reduction to practice must be corroborated by evidence other than that given by the joint applicants."

Here there were neither drawings, models, written descriptions nor other corroboration to substantiate contentions of Gillett and Picciano. (See Rule 216, Rules of Practice, U.S.Patent Office) and therefore, the testimony of Picciano and Gillett in which they support each other as joint inventors with Lockhart is of no value. Furthermore, an inventor who eventually obtains a patent is entitled to incorporate in his specifications suggestions of others who were working with him, Pointer v. Six Wheel Corp., supra, and oral testimony to anticipate an invention which is given many years after the event must be critically analyzed and must prove beyond a reasonable doubt that persons other than the patentee made the invention. Washburn & Moen Mfg. Co. v. Norwood (Barbed Wire Patent), 143 U.S. 275, 12 S.Ct. 450, 36 L.Ed. 154; Drum v. Turner, 8 Cir., 219 F. 188. As the court stated in Young v. General Elec. Co., D.C., 96 F.Supp. 109, 138:

"The court is not unmindful of the high degree of proof required on the part of a defendant who contends that the patentee named in a patent was not in fact the inventor."

And although we have held that there are suspicions of deceit or at least evidence that might easily be translated as an ambition to be known as the sole inventor of the entire idea encompassed by needleless hypodermic injectors, the complete circumstances indicate to us that in this case the evidence and proof were not sufficiently clear, unequivocal and convincing to show fraud or mistake as required by prevailing law.

It is further recognized that the rules as to the weight of the evidence required in an action between the government and a patentee would be greater than that necessary between patentee and some third person. U. S. v. American Bell Telephone Co., supra.

Equally tenable is the doctrine of abandonment which applies in this case to Sutermeister, Roberts and Cambridge, all of whom were unsuccessful in carrying their endeavors to a final stage and should not be heard to defeat Lockhart. Globe-Union, Inc. v. Chicago Telephone Supply Co., 7 Cir., 103 F.2d 722. The perseverance of Lockhart should be rewarded. We do not hold, of course, that perseverance of its own is sufficient to establish validity, but it is an element to be considered and weighed in determining the credibility of witnesses. Lockhart has made a contribution to a great profession—the practice of medicine. And in that connection we quote the court in O'Rourke Engineering Const. Co., v. McMullen, 2 Cir., 160 F. 933 at 939:

"The keynote of all the decisions is the extent of the benefit conferred upon mankind. Where the court has deter-

mined that this benefit is valuable and extensive it will, we think, be difficult to find a well considered case where the patent has been overthrown on the ground of nonpatentability."

Then in Wahl Clipper Corp. v. Andis Clipper Co., 7 Cir., 66 F.2d 162, 165, where it is stated that

"Instead of comparing the mental activities (and eccentricities) of genius and the 'mechanic skilled in the art,' it would seem safer and more accurate to study the product itself and, if possible, ascertain the verdict of the public—the ultimate beneficiary of the contribution."

We hold for defendants and a judgment in accordance with this opinion will be submitted for our signature.