**UNITED STATES of America**

**v.**

**The STANDARD ELECTRIC TIME COMPANY.**

Civ. A. No. 56–280.

United States District Court
D. Massachusetts.

Oct. 15, 1957.

———◆———

T. Hayward Brown and Bernard Wohlfert, Dept. of Justice, Washington, Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Kenneth D. Hudson, Boston, Mass., Walter C. Ross, Springfield, Mass., Roberts, Cushman & Grover, Rudolf Amann, Boston, Mass., for defendant.

WYZANSKI, District Judge.

This case is now before the Court on defendant's motion for summary judgment.

On the alternative grounds of fraud and of mutual mistake, the government brought this suit to cancel Patent No. 2,-509,042 for an Electric Analyzer For Fluid-Distribution Systems, issued to defendant May 23, 1950 on an application made April 5, 1948 by Malcolm S. McIlroy, who died March 4, 1956. Jurisdiction is alleged under 28 U.S.C. § 1345. See United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450.

From the affidavits these facts appear to be undisputed.

A decade ago, McIlroy was an assistant professor on the faculty of the Massachusetts Institute of Technology, and a candidate for that school's degree of doctor of science. A field of his interest was the use of analyzers for fluid networks. In this field an important contribution had been made in a paper published in 1935 by Professors Hazen and Camp of M.I.T. McIlroy read this paper and he also read in the M.I.T. library, where they were available to the general public, four masters' theses prepared respectively by Strandrud, Laurent, Cook, and Quill. Each of these theses concerned electric analyzers for fluid distribution systems. Each author had been a student at M.I.T., and had done his work under the direction of Professor Hazen. After reading these papers and working in the general area, McIlroy submitted to M.I.T. a doctoral thesis entitled "Studies of Fluid Network Analysis and The Basic Design of an Analyzer for Fluid Distribution Systems." The text of this thesis and its bibliography cited the four masters' theses as well as the Hazen-Camp 1935 paper. Professor Hazen was chairman of the M.I.T. committee to consider McIlroy's candidacy, and Professor Camp was a member of the committee. They were fully aware of the work previously published in the masters' theses. They and the other members of the committee recommended that M.I.T. should award, and it did award in February 1947, to McIlroy the degree of doctor of science for "original research of a high grade."

With a view to filing a patent application, claiming as an invention the new material in his thesis, November 24, 1947 McIlroy consulted Harold L. Gammons, Esq. associated with the New Haven firm of Seymour, Earle, and Nichols. Mr. Gammons had received in 1935 a B.S. degree from M.I.T., and in 1939 an LL.B. degree from the National Law School. After graduating from law school, he had been from 1941 to 1945 in the patent department of Remington Arms Company, Inc.; and in 1946 he had become associated with the Seymour firm. McIlroy had at least two conferences with Gammons. Gammons read McIlroy's thesis. Apparently he did not read, but he did listen to McIlroy's description of, the theses of Strandrud, Laurent, Cook, and Quill. Gammons' affidavit states that both McIlroy and he were convinced that those four masters' theses were not of such relevance that they should be cited in the specification.

April 15, 1948 Gammons filed McIlroy's patent application in the Patent Office. In accordance with 35 U.S.C. § 115 and former Rule 46 of the Rules of Practice of the United States Patent Office (in effect from 1946 to 1950),* McIlroy subscribed to the usual inventor's oath. The following are the texts of the statute, the rule, and the oath.

35 U.S.C. § 115

"§ 115. Oath of applicant. The applicant shall make oath that he believes himself to be the original and first inventor of the process, machine, manufacture, or composition of matter, or improvement thereof, for which he solicits a patent; and shall state of what country he is a citizen * * *"

Rule 46

46. "The applicant, if the inventor, must make oath or affirmation that he does verily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement, or of the variety of plant, for which he solicits a patent; that he does not know and does not believe that the same was ever known or used before his invention or discovery thereof, and shall state of what country he is a citizen and where he resides, and whether he is a sole or joint inventor of the invention claimed in his application. In every original application the applicant must distinctly state under oath that to the best of his knowledge and belief the invention has not been in public use or on sale in the United States for more than one year prior to his application, or patented or described in any printed publication in any country before his invention or more than one year prior to his application, or patented in any foreign country on an application filed by himself or his legal representatives or assigns more than twelve months prior to his applica-

tion in this country. If any application for patent has been filed in any foreign country by the applicant in this country, or by his legal representatives or assigns, prior to his application in this country, he shall state the country or countries in which such application has been filed, giving the date of such application, and shall also state that no application has been filed in any other country or countries than those mentioned, and if no application for patent has been filed in any foreign country, he shall so state. This oath must be subscribed to by the affiant."

McIlroy's Oath

"* * * that I have read the foregoing specification and claims and *verily believe* that I am the original, first, and sole inventor of the invention or discovery in 'Electric Analyzers for Fluid-Distribution Systems' described and claimed therein; that *I do not know* and *do not believe* that this invention was ever * * * described in any printed publication in any country before my invention or discovery thereof; or for more than one year prior to this application, * *."
[Emphasis added.]

The Patent Office file wrapper shows that on October 14, 1948 the examiner rejected all McIlroy's claims, and simultaneously made a record of references including the 1935 Hazen and Camp publication, but not McIlroy's thesis or the four masters' theses. In a letter dated December 3, 1948 Gammons replied to the Commissioner of Patents and gave a clear reference at page 10 to McIlroy's thesis. However, it does not appear from the letter, or from the Patent Office file wrapper, or from any other evidence that in either written or oral form, Gammons or, when he came to a Patent Office conference on February 8, 1950, McIlroy explicitly mentioned to the Patent Office the four masters' theses. In-

---

* Now Patent Office Practice Rules, rule 65, 35 U.S.C.A.Appendix.

deed, in opposing defendant's motion for summary judgment, plaintiff offers an affidavit of Witcoff, the Patent Office's assistant examiner present at the February 8, 1950 conference, that although Witcoff recalls the reference by McIlroy and Gammons to the doctoral thesis, he does not recall having been shown a copy of that thesis, nor does he recall any discussion at that conference of the work of others than McIlroy.

Following the conference, the Patent Office granted the patent in its present form on May 23, 1950.

■ Upon the basis of the foregoing undisputed facts, this Court finds that plaintiff has no evidence of fraud either by McIlroy or Gammons; or if there is any evidence, that offered together with that available fall far short of what is requisite in a suit for cancellation of a patent for fraud. United States v. American Bell Telephone Co., 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144.

There has been no showing that under any statute, or rule of the Patent Office, or professional custom, or canon of ethics there is any explicit or implicit obligation resting upon an applicant for a patent or his solicitor to disclose to the Patent Office all the material which he has used in evolving the invention he claims. Cf. Becton-Dickinson & Co. v. Robert P. Scherer Corp., D.C.E.D.Mich., 106 F.Supp. 665, 674–675, affirmed 6 Cir., 211 F.2d 835.

■ The applicant's obligation under 35 U.S.C. § 115 and under former Rule 46 was to state whether to the best of his knowledge and belief the invention has been described in any printed publication. Of course, a putative inventor must disclose any printed publication which he either knows or believes describes the very invention claimed. United States v. American Bell Telephone Co., 128 U.S. 315, 355–356, 9 S.Ct. 90, 32 L.Ed. 450. More than this, if he knows of a printed publication which plainly describes his claimed invention, or comes so close thereto that every reasonable man would say the invention claimed was not original but had been anticipated, then regardless of his personal view that he is the original inventor, he will not be excused for his failure to disclose his knowledge. But the applicant has no duty to cite every publication of which he knows, or which he has used, merely because the publication is one likely to be referred to by a vigilant examiner in the Patent Office, or by a rival in an interference or other proceeding. It is not the object of the quoted statute or rule to supply all available evidence to the Patent Office, or to force the applicant to set up what he regards in good faith as straw men which he reasonably and in good faith believes he can knock down.

■ ˙ In the case at bar the evidence overwhelmingly points to McIlroy's belief that his claimed invention was not described in any prior printed publication, to his good faith in entertaining that belief, and to the reasonableness of that belief. While the Government contends that McIlroy's work was not original, McIlroy consistently regarded the four theses as not being an anticipation, and it seems that his view is shared by one of the four recipients of a master's degree, Quill, and by Moore, who admittedly may be biased because of his employment by defendant. For his conclusion McIlroy had at least two grounds which subjectively and reasonably persuaded him, even though objectively they might not have the slightest persuasive effect upon a court required to pass upon the issue of the validity of the patent.

First, McIlroy knew that the margin of his advance over the four theses was sufficient for M.I.T., acting on the recommendation of two highly qualified professors, to award him a doctor's degree. To be sure, that decision of M.I.T. did not involve a determination by the Institute that the margin constituted patentable invention. Yet, it was reasonable for the author of the thesis to assume that the margin which seemed adequate to the M.I.T. faculty in considering a doctoral candidacy was at least as great as the margin which would be required

by the Patent Office and the courts to constitute patentable invention.

Second, he submitted to counsel of experience and *prima facie* good standing, the full text of his thesis which summarized the earlier progress in the art and specifically cited and commented upon the four masters' theses. There is no indication that the summary was unfair. Moreover, in a conference with Gammons, McIlroy supplemented this written summary by an oral statement about the four masters' theses. McIlroy's patent solicitor did not regard it as necessary that he himself should study the masters' theses before he prepared the oath for McIlroy. And McIlroy accepted the prepared oath as consistent with his own views as well as his lawyer's.

The Government has not filed any affidavit reciting any evidence (aside from McIlroy's use of the masters' theses) indicating McIlroy's lack of good faith. At the pre-trial the Government disclaimed any intention of summoning to the trial any witnesses except expert witnesses on the issues of originality and anticipation. McIlroy, being dead, cannot himself be examined. Nor has the Government in its pleading alleged that Gammons was in bad faith, nor has it argued that if Gammons were called to the stand for cross-examination it might show that he or McIlroy was in bad faith. One can imagine, of course, cases in which an applicant makes an incomplete disclosure to his solicitor, or deliberately selects a solicitor who is inexperienced, or careless, or gullible. One can suppose a solicitor aiding the client to make a representation which the solicitor believes is inadequate, or in which the solicitor has no confidence, or for which the solicitor knows there is no adequate basis. Cf. Restatement, Torts, § 526. Such a representation by the client or indeed by his solicitor (cf. Restatement, Agency § 259) might well warrant a cancellation. But the Government has never suggested that if testimony were elicited from Gammons on the stand or by deposition, the case at bar would turn out like one of those supposititious situations. Hence this is not like those cases of alleged fraud in which a court refuses to sanction a motion for summary judgment because it wants to give the complainant an opportunity to cross-examine, the alleged tort-feasor.

■ Beyond what this Court now has before it, all that the government is prepared to try to show is that McIlroy and Gammons were mistaken in their estimate of the legal effect of the four masters' theses, and that these four theses were the original of, or an anticipation of, the claims of invention. Such a showing together with the evidence now before this Court would not constitute proof of fraud. Cf. United States v. Cold Metal Process Co., 6 Cir., 164 F.2d 754. It would not be an appropriate foundation of a suit for cancellation on the ground of mutual mistake. Ibid. It would be effective only if the Government had a right to cancel a patent on the ground of invalidity because of anticipation by publication in the prior art. There are some who believe that the Government ought to have a right to bring such a suit. See, for example, Senate Report No. 1464, S.Res. 92, 84th Cong., 2nd Sess. p. 13. But so far Congress has not agreed to give the Government this right. And it is unsuitable for a court without legislative authority behind it, to create this right. Cf. United States v. Bell Telephone Co., 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144.

Motion for judgment for defendant granted.